## Coble's Appeal

*Lawrence C. Zeger* and *Charles H. Davison*, for appellant.

*William C. Hazlett* and *Lewis F. Adler*, for appellee.

WINGERD, P. J., August 26, 1947.—This is an appeal from the action of the Superintendent of Public Instruction sustaining the action of the Board of School Directors of the School District of Metal Township dismissing Llewellyn Coble as a professional employe of said district. Appellant elected to have the matter heard de novo and by stipulation of both appellant and

appellee the records of the evidence taken before the school board and before the Superintendent of Public Instruction were admitted in evidence, to be considered by the court as fully as if the witnesses had been called and examined before the court, the parties to have the right to call for cross-examination any witnesses who had been called and to offer such additional testimony as they desired. All objections as to the procedure before the board were waived.

Llewellyn Coble, appellant, had a temporary teaching certificate for the School District of Metal Township, Franklin County, for the year 1943-1944 and was given a permanent contract for the year 1944-1945, which was renewed for the year 1945-1946. He had taught nine years in Montgomery Township, Franklin County, Pa., before coming to Metal Township. In July 1946 certain charges were made by E. E. Blackburn, supervising principal of the School District of Metal Township, against appellant. These charges, which form the basis of the present proceeding, are as follows:

"That the professional employe has been guilty of persistent negligence and also persistent and wilful violation of the school laws of the Commonwealth, in that:

"1. He has repeatedly and on numerous occasions refused to comply with the following reasonable requests and instructions from the supervising principal and has persistently and wilfully refused and failed to be at the school building at least 30 minutes before the time for opening school, a regulation given all teachers at the beginning of the past school term, and which regulation was obeyed by all other teachers, the said Llewellyn Coble coming to the building regularly anywhere from 10 minutes to an hour after the opening of the school when he should have been in charge of classes.

"2. Wilfully and persistently refusing to see that the pupils were in their proper places and quiet in the least possible time after the ringing of the bell.

"3. Persistent and willful refusal and negligence in seeing that the pupils are seated and quiet before dismissal, both at noon and at the closing of the school day.

"4. Persistently and wilfully refusing to have the pupils pass to and from different classes promptly and orderly.

"5. Persistent and wilful refusal to keep order in his classes.

"6. Persistent and wilful violation of the school laws of the Commonwealth of Pennsylvania in that on a number of occasions, pupils smoked cigarettes on the premises in the presence of the professional employe without any effort on his part to correct this violation.

"7. Persistent and wilful violation of the school laws of the Commonwealth of Pennsylvania in that the said Llewellyn Coble has frequently made defamatory statements to persons in authority with reference to the Franklin County Teachers Credit Union, an educational organization for the benefit of all professional employes and also the writing of derogatory remarks to the various school directors of Metal Township School District, criticizing the management and operation of the school, which letters have been addressed to the Metal Township School Board, said letter being dated October 1, 1945; Mr. H. H. Bock, member of the board, said letter dated July 9, 1945; Mr. George W. Baker, former member of the board now deceased, said letter being dated March 27, 1946; Mr. Fred Shearer, said letter being dated March 25, 1946; Mr. George W. Baker, now deceased, said letter being dated May 11, 1946; Mr. William Curfman, said letter being dated June 8, 1945, and to Mr. Fred W. Shearer, said letter being dated June 12, 1946, together with other letters, which have from time to time been written and state-

ments made criticizing not only the local school board, but the State Educational Association, including the Superintendent of Public Instruction."

At the hearing, appellee stated that the only charges which were pressed and which were to be considered were the first five and the subject matter of the sixth, insofar as it pertained to the actual smoking by students on the school premises, as additional evidence of persistent negligence. In short, the only reason pressed for the dismissal of appellant is persistent negligence.

The manner in which a professional employe of a school district may now be discharged is definitely regulated by statute. Under section 1205 of the School Code of May 18, 1911, P. L. 309, as amended finally by the Act of May 16, 1945, P. L. 587, 24 PS §1126, the only valid causes for the termination of a contract entered into between the school district and a professional employe, in accordance with the provisions of that section, are "immorality, incompetency, intemperance, cruelty, persistent negligence, mental derangement, persistent and wilful violation of the school laws of this Commonwealth on the part of the professional employe" (subsection (a) ), and in subsection (b) it is provided that "In determining whether a professional employe shall be dismissed for incompetency, the professional employe shall be rated by an approved rating system which shall give due consideration to personality, preparation, technique, and pupil reaction, in accordance with standards and regulations for such scoring as defined by rating cards to be prepared by the Department of Public Instruction . . ., and to be revised, from time to time, by the Department of Public Instruction with the coöperation and advice of a committee appointed by the Superintendent of Public Instruction, including representation from county and district superintendents of schools, classroom teachers, school directors, school supervisors, and

such other groups or interests as the Superintendent of Public Instruction may deem appropriate." Further on, in subsection (b), it is provided:

"It shall hereafter be the duty of boards of school directors to cause to be established a permanent record system, containing ratings for each teacher employed within the district, and copies of all ratings for the year shall be transmitted to the teacher upon his or her request, or, if any rating during the year is unsatisfactory, a copy of same shall be transmitted to the teacher concerned. No teacher shall be dismissed under this act unless such rating records have been kept on file by the board of school directors."

The act then goes on in a number of subsections from (d) through (j) inclusive to provide the procedure to be followed by a school board in dismissing a professional employe and providing rights of appeal to the Superintendent of Public Instruction and then to the court of common pleas. The portions of subsection (b) quoted were included in the amendment of June 20, 1939, P. L. 482, 24 PS §1126.

As we have said, all questions concerning matters of procedure have been waived and the matter came before this court de novo. A great deal of testimony was presented to this court which was not presented before either the school board or the Superintendent of Public Instruction.

The evidence presented is of considerable quantity and this court has gone over it very carefully and endeavored to analyze it and to individuate those parts which are applicable to the different charges made. We will consider each charge in the order in which it is made.

In considering the evidence, we must bear in mind that the burden is upon appellee to prove, at least by a preponderance of the evidence, the charges made:

Horosko v. Mt. Pleasant School District et al., 135 Pa. Superior Ct. 102, 110.

Mr. Blackburn testified that he had drawn up certain regulations for the teachers which he had given to them. These regulations were as follows:

"A. That pupils are in their proper places and *quiet* in the least possible time after bells ring.

"B. That they be seated *quiet* before dismissal, both at noon and the close of the day.

"C. That they pass to and from classes promptly and orderly.

"D. That toilet privileges be limited (except as emergencies arise) to the time between the second and third periods, both morning and afternoon.

"E. Each teacher has the authority to speak to any student at any time in the enforcement of the above mentioned.

"Assignments:

"Be specific and *demand completed work on time* from each and every student.

"Time of arrival:

"We need not expect punctuality from our constituency unless we show them that we ourselves 'practice what we preach'.

"Each teacher should be and is expected to be at or in the building at least 30 minutes before time of opening.

"Reports:

"Monthly reports are due on the third of each calendar month. All illegal absences must be reported promptly."

The contention is made that the violation of regulations made by a supervising principal is not a cause for dismissal because such regulations are to be made by the board of school directors: section 404 of the School Code, 24 PS §338. However, the contract form set forth in section 1205 of the School Code, 24 PS

§1126, plainly contemplates that the supervising principal shall have the right to make reasonable rules for the conduct of the school of which he has supervision and it is only reasonable to assume that, as supervising principal, he has the right to make and enforce proper and reasonable rules and regulations for the teachers to follow.

The first charge is that appellant refused to comply with the rule of the supervising principal that the teachers should be at or in the school at least 30 minutes before opening, "which regulation was obeyed by all other teachers, the said Llewellyn Coble coming to the building regularly anywhere from 10 minutes to an hour after the opening of the school when he should have been in charge of classes".

There was no evidence produced to support this charge as stated. It will be noticed that the charge is that the "regulation was obeyed by *all other teachers*, the said Llewellyn Coble coming to the building *regularly* anywhere from 10 minutes to an hour *after* the opening of the school when he should have been in charge of classes". (Italics supplied.) Mr. Blackburn, who gave practically all the evidence concerning this matter, largely from notes he had made as to the time of appellant's arrival during the years 1944-1945 and 1945-1946, stated no instance in which appellant came to the building one hour after the opening of school. In fact, he stated only six instances in two years when appellant arrived 10 minutes or more after the opening of school. Four of these instances occurred in the year 1944-1945, on December 22, 1944, January 31, February 5 and February 6, 1945, and two in the school year 1945-1946, one on November 12, 1945, when he stated appellant said he had tire trouble coming over, and the other on February 6, 1946, when the roads were very icy. There were five times cited in the year 1944-1945 when appellant arrived at 9 o'clock or after

9, but not later than 9:05, and in the school year 1945-1946, there were five instances in which appellant arrived at 9 o'clock or later, but not later than 9:05. Mr. Blackburn gave six instances in 1944-1945 and 12 instances in 1945-1946 in which appellant arrived after 8:30 but before 9 o'clock, which he said were samples, as he did not take down every time appellant arrived after 8:30. It is interesting to note that in 1944-1945 the days referred to began with December 11th, and with the exception of one in April and one in May, ended the beginning of March, and in 1945-1946 began with October 22nd, and, with the exception of one in May, ended with March 21st, practically all being in the winter months. The fact that appellant is shown to have arrived only six times after 9:10 in the morning in two school years, two of which are explained by tire trouble and icy roads, and two occurring in successive days in February, when the roads might well be icy or blocked with snow, and appellant having stated that he was late twice when the roads were blocked with snow, one of which times a truck also blocked him, does not in any way substantiate the charge made. The charge is entirely different than the position taken by Mr. Blackburn and the school district during the hearing before this court. There the contention was made that the times of arrival stated by Mr. Blackburn showed that appellant regularly arrived after 8:30, which was 30 minutes before the time for opening school, school opening at 9, and that the times stated were merely a sample or an example of what he did regularly. Appellant's answer to this was that when he had first been employed, Mr. Blackburn and the then president of the school board, Mr. Rosenberry, came to his home to ask him to come as a teacher to Metal Township and that at that time he told them that he could not by reason of the fact that he was living on a farm approximately 25 miles from the

Metal Township school comply with the ordinary regulation that he arrive 30 minutes before school and that Mr. Blackburn, with Mr. Rosenberry present, stated that they would make allowances for that and he was to do the best he could. He stated that he had done the best he could and that in the three years he had not been late more than three or four times a year. Insofar as the arrangement was concerned, his mother, a very respectable elderly lady, stated that she was present at the conversation and heard the conversation as recited by her son. Mr. Rosenberry and Mr. Blackburn both stated they did not remember anything like that having been said. It is the court's recollection that neither of them were asked whether, if it had been said, they would have remembered it. Mr. Blackburn was asked if he would say that nothing like that had been said and he said he would not. One student, who rode a bus which arrived about 10 minutes before 9, stated that he frequently saw appellant pass the bus on his way to school at a point about three miles from the school. He was contradicted by the bus driver, employed by the school district, that he often passed appellant about a mile from the school, after he had left there, which would be a little before or about 9 o'clock. Mr. Blackburn stated that he talked to appellant concerning this matter six or eight times during the three years he was there but the details of such conversations or anything definite in regard to them was not forthcoming. There was evidence produced and uncontradicted that the music teacher for sometime arrived on the bus about 10 minutes of 9 and that several other teachers did not arrive regularly at 8:30, which indicates that the rule involved was not one which was strictly enforced. This is easily understandable because in this school there was a janitor who undoubtedly opened the building in the morning and there was no absolute necessity for the teachers to be present any definite length of time before

the opening of school as there was in the case of Spruce Hill Twp. School District v. Bryner, 148 Pa. Superior Ct. 549, where there was only one teacher, whose duty it was to open the school, etc., in preparation for the arrival of the students.

In connection with this testimony, we take note that prior to the latter part or end of the third year of appellant's employment no complaint was made to the school board, or at least he was not called before the school board because of his times of arrival, and then, after certain difficulties had arisen between him and Mr. Blackburn, which included a controversy about the withholding of a day's pay from appellant and deducting from his pay dues of a certain teacher's association; that his contract was changed from a temporary to a permanent one at the end of the first year, although Mr. Blackburn stated he arrived less than 30 minutes before school time the first year, during which year school started at 8:50, but not so late as the second and third years; that his contract was renewed after the second year when he was as late, according to Mr. Blackburn's samples, as he was the third year.

In reference to this charge, the first, we find that appellant accepted his position as a teacher in Metal Township School District under an arrangement whereby it was understood that he did not have to comply with the rule requiring teachers to arrive at least 30 minutes before the opening of school and that the evidence does not show any persistent negligence on the part of appellant. The charge is dismissed. We have gone into this testimony and made this finding as we do not desire to be technical in reference to the charges made although, as we hereinbefore stated, there was absolutely no evidence to support the charge as made, that is, that appellant regularly arrived 10 minutes to an hour after the opening of school.

In considering the second, third, fourth and fifth charges, we must bear in mind the surrounding con-

ditions. The school building is a one-story building with a basement. On the first story are seven rooms, used for high school and the seventh and eighth grades' school. In the basement is a room used for vocational training and a hallway, which leads from the steps to the boiler room and is used as a laboratory. Appellant taught seventh and eighth grade geography and a number of subjects to the freshmen and sophomores in the high school. His schedule filled all the periods in the week, except three and during these three he had study hall. The last period in the day he taught seventh and eighth grade geography, one half the period the seventh grade and the other half the eighth grade. In one period he taught business arithmetic and plain geometry at one time. The county superintendent stated this was a heavier schedule than the other teachers were carrying but he did not consider it unduly heavy in comparison with normal teaching schedules or other schedules, especially in reference to pupils per teacher. There had been some contention between Mr. Blackburn and appellant concerning this schedule. Mr. Blackburn and appellant seemed to have had arguments about rules and order but what they were about, what was said, when they occurred and under what circumstances was not made clear. Mr. Blackburn's testimony in this respect was vague, indefinite and very general.

As to the second and third charges, Mr. Blackburn testified generally to the effect that appellant did not see that the pupils were in their proper places and quiet promptly after the ringing of the bell and that his pupils were not seated and quiet before dismissal at noon and at the close of the school day. This testimony is supported by no other person. On the other hand, three high school students, two sophomores, one 15 and the other 16 years of age, and one freshman, 15 years of age, all of whom favorably impressed the court, testified that appellant did require them to be seated and

orderly at opening and dismissal. Appellant testified that he required the pupils to be seated and orderly and used corrective measures when there was disorder; that there was no unusual commotion; that sometimes it was difficult for him to get to his home room at noon when he had laboratory, at which time Mr. Blackburn had a class in his home room, and sometimes at the end of the last period when he taught grade geography and had to wait for grade teacher, Mrs. Gobrecht, to return, he only arrived at his home room a minute or two before dismissal. Mrs. Hoke and appellant had the same home room, freshmen and sophomore high school students. Mrs. Hoke was not called as a witness. We find that the second and third charges have not been proved and they are dismissed.

As to the fourth charge, refusing to have pupils pass to and from different classes promptly and orderly, there is no evidence showing any definite act of omission or commission on the part of appellant with reference to this charge. Mr. Blackburn gave some evidence with reference to noise made by the students when going from one class to another, for which he seemed to feel appellant was responsible and stated appellant did nothing to stop it, but there was nothing in his testimony to show any relation between the noise made by the classes and any act or omission on the part of appellant. On the other hand, a seventh grade student testified that noise by the high school students knocking on the door of the grade school room and running and so creating commotion, did not happen as much when Mr. Coble was teaching as it did since he was not there. Appellant testified he did not see anything in pupils passing from one room to another that necessitated disciplinary action. This charge, the fourth, was not proved and is dismissed.

As to the fifth charge, persistent and wilful refusal to keep order in his classes, there is considerable testi-

mony. Mr. Blackburn testified that there was more noise from appellant's rooms than from the other rooms; that he did not keep proper order in classes; and that he saw him reading a magazine different times during classes, but his testimony was rather general and indefinite. Mr. Curfman, a member of the school board, stated that on December 6, 1945, he was in the hallways and the basement from about 10 or 10:30 a.m. until noon; that there was more noise from appellant's room than the other rooms; that the noise sounded like several people talking. It was shown that at the time stated by Mr. Curfman, appellant was teaching two classes, one business arithmetic and the other plain geometry at the same time, in the room referred to, and that in the room at that time the home economics class was preparing luncheon for the students. Such a congestion of operations with young people involved would undoubtedly cause more noise than would come from a room where one teacher was teaching a class in the ordinary way. Appellant taught geography to the seventh and eighth grade pupils the last period of the day, half the period to the one grade and half to the other. To do this, he left his home room and took over the grade room, which normally was taught by Mrs. Gobrecht, the sister of the president of the school board. Next to this room, separated by one wall, was the room in which the school band practiced three times each week during the last period. A number of the seventh and eighth grade students were members of the band and they left the room during this period to play in the band. Mrs. Gobrecht testified that when she returned to her room, on numerous occasions just before dismissal, she found some paper wads around and found that the chairs in the room had been moved and that there was some confusion, some students getting their wraps and others had changed seats. Mrs. McVitty, a substitute teacher for Mrs. Gobrecht, was

there 3½ days during the school year 1945-1946. Before leaving the room she stood for 10 or 15 minutes in the back of the room after appellant began to teach and she said she saw paper wads being thrown, students moving about. She didn't know whether appellant saw them but she would have seen it and any reasonable person would have seen it. She stated there was pandemonium. When asked why she did nothing, she said she did not think, as a substitute teacher, perhaps she had any right to say anything. We wonder why she stayed and why, as this was her home room and appellant was only taking the last period in geography, she did nothing to stop the confusion which she said her students were engaging in after appellant came there to teach them during the last period. Two grade students, young girls, one of them a member of the band, said that during the last period, when appellant taught that grade, the students did move chairs around, put magazines, such as comic books, in their note books, and engaged in conversation while appellant was teaching. They didn't seem to know whether appellant saw this or not as he was teaching, but they both said the order was not as good as when Mrs. Gobrecht and Mrs. McVitty were teaching there. They both stated that appellant corrected the students or punished students for misbehaving by making them write a large number of words, hundreds. They were both a little indefinite as to punishment. On the other hand, two grade students, one of whom appeared to be an exceptionally alert and bright boy, testified that there was some throwing of spit balls and some misbehavior in the room but that appellant corrected the students when he saw it done. One said he made them write words, stay after school or paddled them. The other said there was a little bit more conversation than when the other teachers were there but that the eighth grade geography class was just about the same as any other class.

There was also testimony by two high school students that on one occasion, while appellant was teaching two classes in his home room and the home economics department was preparing lunch, a couple of the students got hold of a sandwich or something and ate it. On the other hand, several high school students in appellant's home room were called. One testified that appellant kept good order, another he kept order and another the order in the appellant's classes was the same as in other ones. All testified he corrected students who misbehaved and two of them testified that he had corrected them. There was also testimony that some of the students slipped out of the laboratory into the boiler room and smoked, either before, or during class when the apparatus was being arranged. This laboratory was in a basement hallway, which was entered by an open stairway from above and from which the door to the boiler room led. It was equipped with some closets, a table for the equipment and some boards or benches on which the students sat. No one testified that the students smoked in the presence of appellant or that he saw them smoking. Appellant stated that he maintained excellent order; that of course there was some misbehavior in his classes, as would be expected, and he punished those who misbehaved; that he did not recall reading magazines except during study groups; that on his late arrival to the laboratory in the basement some of the students were in the boiler room, that he smelled smoke, that he forbid them going in the boiler room and from then on they did not go in.

It will be noticed that practically the only testimony of any misbehavior which would not be ordinarily expected in a school of young people is in reference to the seventh and eighth grades, which appellant taught the last period in the day, all of his other classes being high school classes. The testimony of the students called is at variance. The testimony of Mrs. Gobrecht

is based on what she states was the condition of the room when she returned to it. The testimony of Mrs. McVitty as to the confusion does not show any refusal on the part of appellant to keep order but that there was some disturbance which might be considered by some no more than natural and by others as unusual. The fact that she did nothing to correct her own students, but remained in the room, is peculiar. We cannot find from the testimony that appellant was guilty of persistent and wilful refusal to keep order in his classes or that he is guilty of persistent negligence. We find that the fifth charge has not been proved and is dismissed.

The general charge of persistent negligence has not been sustained by the evidence; appellant is found not guilty of persistent negligence as a professional employe of the School District of Metal Township.

There is another ground upon which the second, third, fourth and fifth charges can be dismissed.

After appellee had rested and appellant had offered his evidence appellant moved that as appellee had not shown that rating cards had been kept by it in accordance with the School Code, the charges be dismissed, the School Code providing that "no professional employe shall be dismissed unless rating cards are kept": section 1205(b), 24 PS §1124. Appellee asked leave to open its case for the purpose of showing that rating cards were kept. The court granted the motion and appellee offered three rating cards produced from the custody of the county superintendent of schools relating to appellant, dated June 1, 1944, June 5, 1945, and June 1, 1946, and a paper purporting to be a resolution passed by the Metal Township School Board authorizing the county superintendent to keep rating cards for all teachers in that school district, which, was signed by the president and attested by the secretary of the school board. Appellant objected to the ad-

mission of the resolution as the best evidence was the minute book of the school board and to the rating cards because they were not kept on file by the school board. The court reserved ruling. The objection to the resolution is sustained and to the rating cards is overruled. The county superintendent has a right and perhaps a duty to keep rating cards. Whether these rating cards are sufficient compliance with the School Code to allow a dismissal of a professional employe for a cause unconnected with the charge of incompetency or whether any rating cards are necessary in such a case, we do not decide. However, under the School Code, a charge of incompetency must be supported by ratings. There were no ratings or rating cards offered in the present case except the three cards mentioned, all of which, signed by the assistant county superintendent of schools, rate the appellant satisfactory in every way mentioned on the cards, including classroom generalship and habits of conduct of pupils.

In Gulich Township School District v. Korman, 31 D. & C. 197, 203, it is said:

". . . incompetence is used in a broad sense in the School Code, and does not refer merely to the lack of ability, scholastically or otherwise. As stated in the case of Vasbinder's Appeal, 29 D. & C. 597, it covers all the relations between the teacher and the student body".

"The term 'incompetency' has a 'common and approved usage'. The context does not limit the meaning of the word to lack of substantive knowledge of the subjects to be taught. Common and approved usage give a much wider meaning. For example, in 31 C.J., with reference to a number of supporting decisions, it is defined: 'A relative term without technical meaning. It may be employed as meaning disqualification; inability; incapacity; lack of ability, legal qualifications, or fitness to discharge the required duty'. In Black's Law Dictionary (3rd edition) page 945, and

in Bouvier's Law Dictionary (3rd revision) p. 1528, it is defined as 'Lack of ability or fitness to discharge the required duty.' Cases construing the word to the same effect are found in Words and Phrases, 1st series, page 3510, and 2nd series, page 1013. Webster's New International Dictionary defines it as 'want of physical, intellectual, or moral ability; insufficiency; inadequacy; specif., want of legal qualifications or fitness.' Funk & Wagnalls Standard Dictionary defines it as 'General lack of capacity of fitness, or lack of the special qualities required for a particular purpose": Horosko v. Mt. Pleasant Twp. School District et al., 335 Pa. 369, 374-375.

Competency or incompetency can best be determined by the judgment of those who are so competent in the line of endeavor involved or who are so familiar with the kind of work required and the matters which should be accomplished under the circumstances and conditions existing that they can, as experts, judge whether a person is competent or not. (See Conley's Appeal, 30 D. & C. 593, 595-596.) The School Code recognizes this fully when it provides that in determining whether a professional employe shall be dismissed for incompetency he or she shall be rated by an approved rating system. What the School Code undoubtedly means is that where the question of incompetency arises in the broad sense, as defined by lexicographers and by the courts, no professional employe shall be dismissed except on the basis of proper ratings. It undoubtedly contemplates that such persons as county superintendents, assistant county superintendents, supervising principals, other teachers, etc., shall, after investigation and a knowledge of the facts, rate the teacher whose competency is questioned, supporting such ratings by anecdotal matter so that the school board shall have the opinion of experts on which to act and not a confusion

of incidents or general statements: Mulhollen Appeal, 155 Pa. Superior Ct., 587, 589-597.

Such matters as keeping order among the pupils and maintaining proper discipline relate to the competency or incompetency of a teacher. We are fully supported in this conclusion for the rating cards offered in evidence, which indicate on their face that they are official, issued by the Department of Public Instruction, and set forth the basis of rating provided by the School Code, include under the heading "technique", the subheadings "Classroom Generalship", "Planning and Organization", and under the heading "Pupil Reaction", the subheadings "Habits of Conduct", "Attitudes". It is easy to see from a review of the evidence, which we have made in passing upon the charges as such, that the charges made in this case, except the arrival at the school, relate to classroom generalship, habits of conduct on the part of the pupils and the attitude of the pupils. Aside from our findings on the charges as such, there can be no dismissal of appellant on the second, third, fourth or fifth charges as they charge incompetency and are unsupported by ratings of him made in accordance with the School Code. The substance of a charge constitutes its character; not the name given it: Batrus' Appeal, 148 Pa. Superior Ct. 587. See also Horosko v. Mt. Pleasant Twp. School District et al., 335 Pa. 369.

Now, August 26, 1947, the action of the Superintendent of Public Instruction sustaining the action of the Board of School Directors of the School District of Metal Township dismissing Llewellyn Coble as a professional employe of said district is reversed and it is ordered and decreed that the said Llewellyn Coble is to be retained as a professional employe of said district. The costs shall be paid by the School District of Metal Township.